In re NANTUCKET ISLAND ASSOCI-
ATES LIMITED PARTNERSHIP
UNITHOLDERS LITIGATION.

No. 17379.

Court of Chancery of Delaware,
New Castle County.

Submitted: Sept. 26, 2002.

Decided: Oct. 8, 2002.

Norman M. Monhait, Esquire, Rosenthal Monhait Gross & Goddess, P.A., Wilmington, Delaware; Pamela S. Tikellis, Esquire, Chimicles & Tikellis LLP, Wilmington, Delaware; Lawrence A. Sucharow, Esquire, Goodkind Labaton Rudoff & Sucharow LLP, New York, New York; George W. Croner, Esquire, Kohn Swift & Graf, P.C., Philadelphia, Pennsylvania, Attorneys for Plaintiffs and the Class.

Gregory P. Williams, Esquire, Raymond J. DiCamillo, Esquire, Becky A. Hartshorn, Esquire, Richards, Layton & Finger, Wilmington, Delaware; Barbara L. Moore, Esquire, John J. Tumilty, Esquire, Edwards & Angell, LLP, Boston, Massachusetts, Attorneys for Defendants.

## OPINION

STRINE, Vice Chancellor.

This opinion resolves cross-motions for partial summary judgment in a case involving a limited partnership. The multiple issues raised defy easy summarization, but one bears emphasis.

The parties here cross swords over whether the general partner had the unilateral authority to: i) issue a new class of preferred units having superior claims to capital and income distributions and ii) amend the partnership agreement to subordinate the contractual distribution rights of the existing limited partners to those new claims. The general partner supports its argument that it had the unilateral authority to take these actions by pointing

to language in the partnership agreement and arguing that it can be read to grant the general partner implicit authority to amend the agreement when necessary to afford rights to new unitholders.

In this opinion, I decline to adopt the general partner's reasoning. When the partnership was created, the general partner had the freedom to draft a clear and explicit grant of authority to itself to amend the partnership agreement in these circumstances. But the general partner did not do so. Indeed, the better reading of the agreement as a whole is that the limited partners were required to assent to any amendment that affected their substantial rights. As important, because the agreement can reasonably be read to require limited partner approval of amendments of that nature, any ambiguity in the agreement must be resolved in favor of this interpretation, which vindicates the reasonable expectations of the investors.

For these reasons, the plaintiffs in this case are entitled to summary judgment on their claim that the general partner breached the partnership agreement by purporting to amend it unilaterally. This case therefore stands as yet another example of how important it is to draft limited partnership agreements carefully. Although our law permits a limited partnership agreement to invest far-ranging authority in a general partner, it also requires a clear and unambiguous articulation of that authority so that investors are given fair warning of the deal they are making by buying units. When a general partner drafts an agreement that is susceptible to more than one reasonable interpretation, the one most favorable to the public investors will be given effect.

## I.

### A.

This is an action by plaintiffs who are limited partners in Nantucket Island Asso-

ciates Limited Partnership (the "Partnership"). The Partnership was formed in 1987 to beneficially own and operate, through another partnership known as Sherburne Associates, a portfolio of properties located on Nantucket Island, Massachusetts. This portfolio was specifically defined as the "Property" in the agreement governing the Partnership (the "Agreement" or "Partnership Agreement").

The Property, in simple terms, consisted of four types of holdings:

■ The "Hotel Properties"—These consist of the Harbor House Hotel and the White Elephant Hotel.

■ The Wharf Cottages—These are cottages adjacent to the Nantucket Harbor that are rented to summer vacationers.

■ The Nantucket Boat Basin—This is the only privately-owned boat basin in Nantucket Harbor.

■ The Commercial Properties— These are 51 buildings located in and around Nantucket Harbor, which are rented out as offices, restaurants and shops.

The Partnership has three general partners, all of whom are affiliates. They are defendants Three Winthrop Properties, Inc., Winthrop Financial Associates, A Limited Partnership, and First Winthrop Associates. Winthrop Financial Associates is the Managing General Partner. Hereinafter, the General Partners are referred to collectively as the "General Partner," unless their separate identities are relevant.

### B.

This lawsuit was inspired by events occurring in the period from 1996 to 1998.

The plaintiffs, however, say it is necessary to place these later events in the context of the Partnership's performance from the date of its creation in 1987 until the mid–1990s. The purpose of the Partnership was to generate economic returns for the Partners, either in the form of distributions of operating income or capital gains from sales of all or part of the Property.

This goal was, as of 1996, still to be achieved. By then, nine years had come and gone without distributions to the limited partners. Moreover, the Partnership was still struggling under the weight of over $25 million in debt related to the Partnership's initial acquisition of the Property. In 1995, the Partnership restructured this debt to extend its maturity until 1997. One of the prices for this restructuring, however, was an agreement that the Partnership could not make distributions to the partners until it paid off the debt principal.

During that period, the General Partner considered various options to address this debt. For example, the General Partner evaluated whether to sell the Commercial Properties to a real estate investment trust (or "REIT") controlled by one of their affiliates. This would have generated cash to help obtain a more favorable refinancing. Because of increasing interest rates and a weak real estate market, the General Partner says, this option did not transpire.

In this same time frame, the Partnership informed the limited partners that among the alternatives under consideration by the General Partner was a sale of portions of the Property. According to the plaintiffs, however, the General Partner undertook only desultory efforts towards this end, which did not involve any formal effort to market the Property through a broker.

In July 1995, the entity which controlled the General Partner changed. This resulted in the replacement of certain of the officers and directors of the General Partner and, therefore, in new management for the Partnership itself. With this new management came new strategic thinking, the plaintiffs argue.

According to the plaintiffs, the new management team gave thought to whether to have the General Partner make a tender offer to buy limited partner units, to sell parts or all of the Property, or to raise new capital through a rights offering. In early 1996, the new management team asked the day-to-day manager of the Property, Henry Wyner, to write a memorandum evaluating sales prospects for the components of the Property. Shortly after this memorandum was finalized,[1] Wyner received a letter from a Nantucket real estate broker, J. Pepper Frazier, which conveyed an offer by an unidentified person to purchase the Hotel Properties for $15 million if a list of conditions could be satisfied (the "Frazier Inquiry").[2] According to the Partnership's then-Chief Operating Officer, Richard McCready, he had earlier asked Frazier "to keep his eyes open and see if he found anybody that was interested."[3]

Although the record is disputed regarding the reasons why, the Partnership never followed up on the Frazier Inquiry. After fact discovery has been completed, the identity of Frazier's prospective buyer remains unknown.

---

1. *See* Pl.'s Exhibits Cited in their Briefing of the Parties' Cross–Motions for Partial Summ. J. Ex. 9 (hereinafter "PX __").

2. *See* PX 10.

3. McCready Dep. 196.

The plaintiffs allege that the General Partner never followed up because it had decided by the time of the Frazier Inquiry to raise new capital through a rights offering rather than by a sale of any of the Property. A memorandum in March 1996 by the second-in-command of the General Partner, Peter Braverman, sketched out the basic terms of an offering whereby the Partnership would raise $10 million in new capital, in exchange for issuing preferred units that guaranteed an 8% return from net cash flow (if any) and a 250% return from net capital proceeds. The capital was needed to finance necessary improvements and renovations that were required on the Property, as well as to provide equity that could be used to obtain a refinancing. Evidence produced by the defendants supports the inference that the Partnership could not meet these funding needs from its operating cash flow and required additional financing. Consistent with this alleged shortfall, the General Partner continued to discuss refinancing possibilities with lenders during the same period that it was considering a rights offering.

## C.

In September 1996, the General Partner initiated the first of the transactions that is the object of challenge by the plaintiffs in this case. That transaction was a "Rights Offering," which gave the existing limited Partners the opportunity to buy one "Preferred Unit" for each unit in the Partnership they held. The price of a Preferred Unit was $13,333 and the 785 Preferred Units equaled in number the then-outstanding limited partner units. Limited partners were also granted an "over-subscription" privilege, which entitled them to buy any unsubscribed for units on a *pro rata* basis.

In return for their investment, Preferred Unitholders were to receive a cumulative preferred annual return of 8% on their purchase price (the "8% Annual Return") and an aggregate cash distribution equal to 250% of their purchase price (the "250% Return"). Each Preferred Unit was to have $\frac{1}{7}$ of the voting power of a limited partnership unit.

The Rights Offering was guaranteed by an affiliate of the General Partner, defendant Zero Main Associates, L.P. Zero Main was a special purpose entity formed solely to purchase any Preferred Units not subscribed to by other limited partners of the Partnership. By this means, it was assured that the Partnership would sell all the Preferred Units. The Offering Prospectus informed the limited partners of this guarantee and of the fact that the guarantor was an affiliate of the General Partner. But the Offering Prospectus did not indicate, one way or the other, whether officers and directors of the General Partner were investors, directly or indirectly, in the guarantor, Zero Main.

In connection with the Rights Offering, the limited partners were also informed that their right to remove the General Partner would be conditioned on a new requirement: the obligation to redeem all the Preferred Units in full by paying the 250% Return plus any unpaid, but accrued, part of the 8% Annual Return (the "Removal Condition").

According to the plaintiffs, the Offering Prospectus was written in such as a way as to discourage the limited partners from subscribing. Having already suffered nine years without distributions, the limited partners were now being asked to cough up another $13,333 to buy a Preferred Unit. In this connection, the limited partners were cautioned about the unsure prospects of the Partnership, the Partnership's inability to pay the 8% Annual Re-

turn in the first year, and the uncertainty of whether a refinancing could be accomplished. Similarly, the Prospectus indicated that no indication could be given that a capital transaction would occur that would generate cash towards the 250% Return.

The Prospectus also contained information regarding the value of the Property, including the Hotel Properties and the Wharf Cottages. In the summer of 1996, the Partnership had commissioned an appraisal of the Hotel Properties and the Wharf Cottages from Whittier Partners. The Whittier appraisal valued them collectively at $9.85 million, a figure disclosed in the Prospectus. But the Prospectus did not reference the Frazier Inquiry purporting to make a conditional offer $15 million for the Hotel Properties and Wharf Cottages on behalf of an unspecified buyer. The Prospectus also provided an estimated value for the Commercial Properties and the Nantucket Boat Basin of $23.6 million and $7 million, respectively.

The Rights Offering was not conditioned on an affirmative vote of the limited partners. Instead, it proceeded solely by action of the General Partners. Once the Rights Offering was concluded, 83% of the new Preferred Units ended up in the hands of Zero Main, the General Partner's affiliate.

### D.

In order to implement the Rights Offering, the General Partner purported to adopt a "Second Amended and Restated Limited Partnership Agreement," which made several substantial changes to the Partnership Agreement. The General Partner's COO, Richard McCready, executed the "Amendment," putatively on behalf of not only the General Partner and the new preferred unitholders, but also the

limited partners who had not subscribed to the Rights Offering.[4]

The Amendment made at least two material changes affecting the interests of the limited partners. First, the Amendment added the Removal Condition, which conditioned removal of the General Partner on the immediate payment of the 250% Return and accrued payments due under the 8% Annual Return. Second, the Amendment altered the distribution formula under the Partnership Agreement to subordinate the limited partners' right to receive distributions of net income or gains from capital transactions to the rights of the Preferred Unitholders to receive the 8% Annual Return and the 250% Return.

### E.

After receiving the capital infusion from the Rights Offering, the General Partner was able to consummate a refinancing in February 1997. The terms of the refinancing allowed the Partnership to extend its obligation to pay the principal balance of approximately $25 million for another three years, with two options to extend for one year each. The terms of the refinancing continued, however, to prohibit distributions to the unitholders, including the Preferred Unitholders.

As promised, the Partnership also used substantial portions of the new capital to make improvements to the Property in early 1997. These included $4 million in expenditures to repair the bulkhead at the Boat Basin and to renovate the Hotel Properties.

In 1997, according to the defendants, the real estate market in Cape Cod and the islands of Martha's Vineyard and Nantucket began to soar. As a result, they say the General Partner began in late 1997 to con-

4. *See* PX 19.

sider seriously whether to sell part or all of the Property. Having invested funds to get the Property in good shape and seeing a marketplace that was placing a high value on real estate on Nantucket, the General Partner perceived this as an attractive time to explore a major transaction and, in early 1998, made the decision to market the Hotel Properties, Wharf Cottages, and the Nantucket Boat Basin portions of the Property.

To that end, the Partnership engaged a consultant to help it market them for sale. In June 1998, those efforts resulted in a sale of the Hotel Properties, the Wharf Cottages, and the Nantucket Boat Basin (the "Sale") for $38,425,000—an amount that was nearly $21.5 million more than the values placed on those properties in the Prospectus for the Rights Offering twenty months earlier. The Sale proceeds were used to pay off the Preferred Unitholders, by providing them with their full 250% Return plus accrued payments due under the 8% Annual Return. This resulted in the payment for each unit of the $13,333 that was initially invested, plus an additional $21,747 return. Because of its ownership of 83% of the Preferred Units, the General Partner's affiliate, Zero Main, received the overwhelming bulk of these proceeds.

The General Partner did not seek approval for the Sale from the limited partners.

## II.

After the Sale was announced, this and other lawsuits were filed by limited partners who had not purchased Preferred Units. In the amended complaint, the plaintiffs make various arguments as to why the defendants violated the rights of the limited partners in consummating the Rights Offering and the Sale. Some of these arguments will be covered in more detail later in this opinion.

The central basis for the plaintiffs' grievance, however, is relatively simple. They contend that the General Partner exploited its superior knowledge and the weariness of a group of limited partners who had received no distributions for nine years to usurp the value of the Partnership largely for itself. Knowing that the limited partners would be reluctant to put more capital at risk without some prospect of a return, the General Partner downplayed the prospects of the Partnership in the Rights Offering, conscious that this would deter new investments by the limited partners and thereby allow its affiliate to buy most of the new Preferred Units. Not only that, the General Partner took it upon itself to amend the Partnership Agreement to advantage itself as a purchaser of Preferred Units, without seeking (what the plaintiffs argue was) the necessary approval of the limited partners.

After having secured a superior claim on distributions from the Partnership, the General Partner then fixed up portions of the Property and sold them to pay off itself and the other Preferred Unitholders, giving them a handsome return of over 250% for putting their capital at "risk" for only twenty months. This left the Partnership with what the plaintiffs believe is a tiny fraction of the previous asset value of the Property—the Commercial Properties—and with no real prospect to provide a commercially reasonable return to the long-suffering limited partners. Once again, the General Partner acted without a vote of the limited partners, which the plaintiffs contend was required by the Partnership Agreement.

## III.

The plaintiffs' and the defendants' motions for partial summary judgment over-

lap to a large extent. The motions raise four major categories of issues, which I consider in the following order.[5]

Initially, I consider the plaintiffs' argument that the General Partner breached the Partnership Agreement by purporting to adopt the Amendment to the Partnership Agreement without the approval of a majority of the limited partners. Relatedly, I consider the defendants' cross-motion for summary judgment on this same issue, which is premised on the contrary proposition that limited partner approval was not required for the Amendment.

Next, I address the parties' duel regarding whether the sale of the Hotel Properties, the Wharf Cottages, and the Boat Basin could be effected without approval by the limited partners. Each side has moved for summary judgment on this issue.

Then, I resolve the plaintiffs' motion for summary judgment on certain disclosure claims. The motion involves claims that the Prospectus was materially misleading because it failed to disclose: i) the substance of the Frazier Inquiry regarding the Hotel Properties, ii) that the General Partner allegedly had plans to build four new rental cottages; and iii) that the individual officers and directors of the General Partner were investors in Zero Main, the affiliate that was the guarantor of the Rights Offering.

Finally, I decide the defendants' motion for summary judgment on behalf of Zero Main. There are two grounds for this motion: the alleged absence of any evidence that Zero Main: i) knowingly participated

in any breach of fiduciary duty by the other defendants or ii) caused any injury to the limited partners.

## IV.

The standard of review I must apply is familiar. In considering a motion for summary judgment, the record must be construed in favor of the non-moving party. After doing so, the court must grant summary judgment if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. In the face of a properly supported motion for summary judgment, the non-moving party must produce evidence that creates a triable issue of fact or suffer the entry of judgment against it.[6]

The presentation of cross-motions for summary judgment does not, in itself, demonstrate the absence of any genuine issue of material fact. Instead, the court must apply the summary judgment standard to each party's motion and, only after doing so, grant summary judgment to one of the parties if the record and the law justifies that award.[7]

## V.

The first aspect of the cross-motions I address requires me to interpret the Partnership Agreement. The plaintiffs argue that the clear terms of the Partnership Agreement prevented the General Partner from adopting unilaterally the Amendment that accorded the Preferred Unitholders a preferential right to the 250% Return and the 8% Annual Return and that put in place the Removal Condition. In direct

---

**5.** As noted, the plaintiffs are limited partners in the Partnership. The defendants are the General Partners and Zero Main.

**6.** *See, e.g., Burkhart v. Davies,* 602 A.2d 56, 59 (Del.1991), *cert. denied,* 504 U.S. 912, 112 S.Ct. 1946, 118 L.Ed.2d 551 (1992).

**7.** *See Empire of Am. Relocation Servs., Inc. v. Commercial Credit. Co.,* 551 A.2d 433, 435 (Del.1988).

contrast, the defendants argue that the General Partner had the clear authority to adopt the Amendment without a vote of the limited partners.

The interpretative principles relevant to resolving this dispute are familiar. Like other contracts, limited partnership agreements are to be construed in accordance with their literal terms. The terms of the agreement themselves:

> will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language. When the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings, there is ambiguity.[8]

When a limited partnership agreement is ambiguous, the interpretative principle of construction against the drafter tends to be implicated. Unlike negotiated bilateral agreements in which this principle is of more limited utility, most limited partnership agreements are drafted almost exclusively by their founding general partners—or perhaps more accurately, by the lawyers for their founding general partners. For this reason, there is usually no drafting history that could shed light on the shared intentions of the contracting parties—the general partner and the limited partners. As a result, the court is required to resolve ambiguities against the drafting general partner and in favor of the reasonable expectations of the limited partners.[9]

In this case, the application of these interpretative principles leads me to conclude that the Amendment was improperly adopted. The better reading of the literal terms of the Agreement is that the limited partners were required to approve the Amendment. Just as important, the Partnership Agreement is, at the very least, ambiguous on this question. Because the Agreement was drafted exclusively by the Partnership's original general partner, any ambiguity must be resolved in favor of the limited partners' reasonable expectations. Given the text of the Agreement, these expectations included the right to approve the Amendment.

### A.

In explaining why I reach this result, I begin by describing the defendants' contractual argument for the General Partner's exclusive authority to effect the Amendment. The defendants argue that the General Partner's authority to effect the Amendment without approval of the limited partners is contained explicitly in § 4.3 of the Partnership Agreement, which states as follows:

> Section 4.3 *Additional Capital Contributions by Investor Limited Partners and Admission of Additional Investor Limited Partners.*
>
> A. In the event that the Managing General Partner determines that it is in the best interests of the Partnership to raise additional capital for the Partnership, the Managing General Partner may, notwithstanding Section 5.1.B, without the Consent of the Limited Partners, sell additional limited partnership interests in the Partnership. Additional limited partnership interests may be sold on such terms and conditions, and additional Limited Partners shall have such rights and obli-

---

**8.** *Eagle Indus., Inc. v. DeVilbiss Health Care,* 702 A.2d 1228, 1232 (Del.1997).

**9.** *See SI Mgmt. L.P. v. Wininger,* 707 A.2d 37, 43 (Del.1998).

gations, as the Managing General Partner shall determine.

B. In the event that the Managing General Partner determines to issue and sell additional limited partnership interests as provided in Section 4.3.A, the Managing General Partner shall, prior to the offer or sale ·of such interests to Persons other than the Investor Limited Partners, offer such interests to the Investor Limited Partners pro rata in accordance with their Percentage Interests for a 45–day period after notice to the Investor Limited Partners of the terms and conditions of any offering of additional limited partnership interests. . . . [10]

According to the defendants, the portion of § 4.3 that permits the Managing General Partner to sell "additional limited partnership interests" on "such terms and conditions" and having "such rights and obligations, as the Managing General Partner shall determine" necessarily grants the General Partner the authority to amend the Partnership Agreement as necessary to secure the "rights" of the new partners.

The defendants believe that § 11.13.A. of the Agreement makes the existence of this power even clearer. That section states:

A. *This agreement may be* modified or *amended* pursuant to Sections 5.5, 11.2, and 11.13.B, *or with the written consent of the General Partners and the Consent of the Limited Partners, provided that any modification or amendment which would* (i) increase the amount of the Capital Contributions required to be paid by the Investor Limited Partners, (ii) extend the termination date specified

in Section 2.5, (iii) change the method or accelerate the dates for the payment of the Capital Contributions or otherwise increase the liability of the .Investor Limited Partners, *(iv) adversely affect (other than as permitted by Section 4.3) the rights of the Investor Limited Partners under Article IX,* or (v) amend this Section 11.13, *shall require the written consent of all of the Investor Limited Partners.*[11]

They argue that the explicit reference to the General Partner's authority under § 4.3 acknowledges that the General Partner can amend the Agreement unilaterally when that is required to guarantee a right connected to a new issuance of partnership units. In further support of their position, the defendants note that the original offering prospectus for the Partnership warned limited partners of the possibility of dilution and that the limited partners could only protect themselves from this risk by exercising their contractual right to participate on a *pro rata* basis in any future offering.

## B.

In my judgment, whatever surface appeal the defendants' argument has largely vanishes when the issue is considered in view of the substance of the Preferred Units, the specific language of the Agreement, and the legal context in which the Partnership Agreement was drafted. In explaining why I find this to be so, I begin with the nature of the Preferred Units.

The Rights Offering did not involve an issuance of garden variety limited partnership units at, for example, a price that was more favorable than the initial sale of units

---

**10.** Partnership Agreement of Nantucket Island Assocs. Ltd. Partnership (hereinafter "Partnership Agreement"), § 4.3 (emphasis added).

**11.** Partnership Agreement, § 11.13.

in 1987. An offer on those terms would have been dilutive in the most common sense, fully consistent with § 4.3, and would, it seems, have required no amendment to the Partnership Agreement at all.

In contrast to this traditional type of dilution, the Rights Offering involved the creation of what the Offering itself described as an entirely different class of "Preferred" partnership units, whose rights to certain returns had to be fully satisfied before the existing limited partner units could receive distributions. This is not dilution of the kind that reduces the existing limited partners from having a claim on 99% of the potential distributions to, for example, 47%. Rather, the effect of the Preferred Units on the limited partners is more aptly called "subordination" than "dilution."

It is, I suppose, conceivable that providing Preferred Unitholders with this type of superiority in distributions is a "right" of a "new limited partnership interest" within the intended meaning of § 4.3. But reading § 4.3 to empower the General Partner unilaterally to create a different class of limited partner units subordinating the rights of existing holders requires reading into that provision a more sweeping implicit meaning than obviously emerges from a reading of the provision's explicit terms.

In this respect, it is important that one would expect the General Partner's right to create a new class of units to be articulated clearly, rather than as a component part of its authority to "Admit Additional Investor Limited Partners" and to "sell additional limited partnership interest[s]." This expectation is grounded in the legal context in which the Partnership Agreement exists. For starters, the Delaware Revised Uniform Limited Partnership Act ("DRULPA") itself suggests the need for an explicit grant of authority if a general partner is to be empowered unilaterally to i) create a new class of partnership units that has rights senior to those of the existing partners and ii) amend the partnership agreement to include those rights. To wit, § 17–302(a) of DRULPA now states:

A partnership agreement may provide for classes or groups of limited partners having such relative rights, powers and duties as the partnership agreement may provide, and may make provision for the future creation in the manner provided in the partnership agreement of additional classes or groups of limited partners having such relative rights, powers and duties as may from time to time be established, *including rights, powers and duties senior to existing classes and groups of limited partners.* A partnership agreement may provide for the taking of an action, *including the amendment of the partnership agreement,* without the vote or approval of any limited partner or class or group of limited partners, including an action to create under the provisions of the partnership agreement a class or group of partnership interests that was not previously outstanding.[12]

In this respect, the DRULPA mirrors the Delaware General Corporation Law, which permits a certificate of incorporation to include a provision making an "express grant of authority" to the board of directors to issue new classes of preferred stock having such rights as the board, by resolution, determines to include in a certificate of designation.[13] The certificate of

---

12. Emphasis added.

13. 8 *Del. C.* §§ 102(a)(4) (emphasis added). *See also* 8 *Del. C.* § 151(g) (when board has been "expressly vested" with authority to fix rights of a class of stock, it shall file a certificate of designation establishing those rights); *see generally* R. Franklin Balotti & Jesse A. Finkelstein, THE DELAWARE LAW OF COR-

designation amends and becomes part of the corporation's certificate of incorporation.

The authors of the leading treatise on the DRULPA believe that § 17–302(a) of the DRULPA embraces a similar preference that the authority to create a new class or group of limited partners be spelled out explicitly in the partnership agreement:

> A key concept of the Act is that if parties to a partnership agreement desire to establish separate "classes" or "groups" of limited partners, as those terms are used and with the consequences provided for in the Act, such classes or groups should be expressly specified, and the relative rights, powers and duties of the limited partners in such classes or groups should be expressly set forth, in the partnership agreement. Similarly, if parties to a partnership agreement desire to provide certain identified limited partners with different rights, powers or duties from other limited partners, but do not intend to create separate classes or groups of limited partners, such intent should be clearly manifested in the partnership agreement.[14]

At the time the Nantucket Island Partnership was created in 1987, § 17–302(a) did not include what now constitutes its last sentence.[15] That last sentence says that a partnership agreement may provide for actions necessary to the creation of a new class or group of partnership interests, "including the amendment of the partnership agreement," to be taken without a vote of the existing limited partners.[16] It was added to DRULPA, effective September 1, 1988,[17] in the year after the Partnership Agreement was first executed.

As of that time period, the DRULPA contained no general provision addressing how partnership agreements could be amended. This factor contributed to uncertainty, as did the relatively novel status of the limited partnership as a recognized entity having some attributes of traditional general partnerships as well as certain characteristics associated with corporations. Because § 17–1105 of the DRULPA stated that Delaware's general partnership statute provided the first source of default rules to govern any case not addressed by DRULPA itself,[18] there were expressions of judicial support for the proposition that when a limited partnership agreement was silent about the vote required to take a particular action, that action could not be taken without unanimous consent of all the partners.[19] In other words, it is fair to say that as of the inception of the Partnership, the law of

PORATIONS AND BUSINESS ORGANIZATIONS, §§ 5.3–5.12, 8.12 (2002) [hereinafter *Balotti & Finkelstein*].

**14.** Martin I. Lubaroff & Paul M. Altman, LUBAROFF & ALTMAN ON DELAWARE LIMITED PARTNERSHIPS § 5.3 (Supp.2000) [hereinafter *Lubaroff & Altman*].

**15.** *See* 6 *Del. C.* § 17–302 (Westlaw 1987); *see also Lubaroff & Altman*, at H–47–H–48 (showing § 17–302(a) as first adopted in 1985).

**16.** 6 *Del. C.* § 17–302(a).

**17.** *See* 66 Del. Laws 680, 685 & 691 (1987).

**18.** *See* 6 *Del. C.* § 17–1105 (Westlaw 1987).

**19.** *See Kan. RSA 15 Ltd. P'ship v. SBMS RSA, Inc.*, 1995 WL 106514, at *2 (Del.Ch. Mar.8, 1995) ("[I]n the partnership law where the parties fail explicitly to contract with respect to techniques for authorizing [a sale of substantially all assets], the default rule of law ... may ... be unanimity."). For a general discussion of these uncertainties, see 3 Rodman Ward, Jr. et al., FOLK ON THE DELAWARE GENERAL CORPORATION LAW § 17–302.3 (4th ed. Supp.2000–1).

limited partnerships was skeptical of a general partner's ability to amend a partnership agreement unilaterally, in the absence of any clear articulation of that power in the partnership agreement itself.

Then, in 1998, the General Assembly provided additional guidance about this issue, by adopting a new subsection (f) of § 17–302, which reads in pertinent part as follows:

> (f) If a partnership agreement provides for the manner in which it may be amended, it may be amended in that manner or with the approval of all the partners or as otherwise permitted by law. If a partnership agreement does not provide for the manner in which it may be amended, the partnership agreement may be amended with the approval of all the partners or as otherwise permitted by law.[20]

This new subsection reinforced the need for a specific articulation of the manner in which partnership agreement amendments can be effected and clarified that the default rule requires approval of all the partners.

The statutory backdrop is also consistent with the typical commercial practice. In the corporate context, it is almost invariably the case that an award of "blank check preferred" authority to a board of directors is spelled out with a high degree of specificity in a provision of the certificate, which includes an explicit reference to the board's authority to file a certificate of designation spelling out the rights and obligations of new classes of stock.[21] Consistent with this corporate practice, a lead-

ing treatise on the DRULPA contains an example of a limited partnership agreement provision that grants explicit authority to a general partner to issue new units with rights senior to existing units *and* to amend the partnership agreement to embody those superior rights.[22] That example bears little resemblance to the cursory terms of § 4.3 of the Partnership Agreement in this case.

These various factors persuade me that the powers granted to the General Partner by § 4.3 are not nearly as sweeping as the defendants contend. To me, the more obvious reading of § 4.3 is that it gives the General Partner authority to issue additional limited partner units at prices that reflect current market realities and some degree of discretion to grant rights to the new partners to the extent that those rights do not interfere with any right specifically secured to the limited partners by the other terms of the Agreement. When the issuance of new rights will impinge on contractual rights of the limited partners, however, the General Partner is required to amend the Agreement in accordance with the provision of the Agreement that generally governs amendments (*i.e.*, § 11.13.A.), which I will discuss shortly.

Section 4.3 lacks any explicit indication that the authority granted to the Managing Partner under that section includes the authority to grant "rights" to "additional limited partnership interests" when those new rights require a subordination of pre-existing rights granted to the existing limited partners by the explicit terms of the Partnership Agreement. In the absence of an explicit grant of amendatory authori-

---

**20.** 71 Del. Laws 878, 879 (1997) (codified at 6 *Del. C.* § 17–302(f)).

**21.** *Cf. Balotti & Finkelstein,* at F–1–11–F–1–12 (providing certificate form for use in giving board authority).

**22.** *See Lubaroff & Altman,* at F–204–F–205.

ty, a reasonable investor reading the Agreement would have been unlikely to believe that § 4.3 impliedly grants the General Partner the sweeping authority the defendants claim it does.[23] As a result, § 4.3 does not unambiguously state that the General Partner may amend the Partnership Agreement unilaterally in order to give a new right to additional limited partners that would override the rights granted to current unit holders by the Agreement.

## C.

Recognizing that the absence of any explicit reference to the General Partner's power to amend the Agreement in § 4.3 presents them with some difficulty, the defendants have cited to § 11.13.A. of the Agreement as textual support for their argument that amendatory power clearly and unambiguously resides in the Managing General Partner. Upon close examination, however, that section does not aid them.

The first sentence of that section says that the Agreement may be modified or amended in four ways:

1) Pursuant to § 5.5, which permits certain amendments subject to approval by limited partners owning more than 50% of the units. Under this section, a limited partner can be deemed to approve an amendment if she fails to dissent affirmatively to an amendment proposed by the General Partner;

2) Pursuant to § 11.2, which permits the General Partner to act as the limited partners' attorney-in-fact in effecting an amendment, but not when an amendment would "diminish the substantive rights of any Investor Limited Partner";

3) Pursuant to § 11.13.B., which permits the General Partner to amend the Agreement to comply with Internal Revenue Code tax regulations; or

4) "[W]ith the written consent of the General Partners and the Consent of the Limited Partners ..."[24]

None of these four methods of amending the Partnership were used to adopt the Amendment. Section 5.5 approval required consent of a majority of the limited partner units, which was not even sought, much less obtained. Despite a feeble argument by the defendants to the contrary, the limited power of the Managing General Partner to act as an attorney-in-fact under § 11.2 could not be deployed to adopt the Amendment because the substance of the Amendment's terms diminished the substantive rights of the limited partners under the existing terms of the Partnership Agreement.[25] Nor was the Amendment

---

**23.** Consider in this regard the portion of the Amendment that limited the rights of the existing limited partners to remove the General Partner. In order for this provision to potentially implicate § 4.3, one must conceive of the Removal Condition as providing the new Preferred Unitholders with the "right" to receive the 250% Return and any accrued 8% Annual Returns immediately if the General Partner was removed involuntarily. · That is, to shoe-horn this change into § 4.3, what seems to be a defensive protection granted to the General Partner in exchange for its affiliate's willingness to be the guarantor of the Rights Offering must be construed as a "right" of "additional limited partnership interests" and the General Partner's authority to grant that "right" must be assumed to include the implicit power to amend the Partnership Agreement.

**24.** Partnership Agreement § 11.13.A.

**25.** The defendants argue that the Amendments did not diminish any substantive rights of the limited partners because the General Partner retained the authority under § 4.3 to displace any provision of the Partnership Agreement that was inconsistent with new rights granted to additional limited partners

proper as a tax compliance change under § 11.13.B. Finally, the amendment was not adopted pursuant to the catch-all provision of § 11.13.A., which allows for the adoption of amendments "with the written consent of the General Partners and the Consent of the Limited Partners."[26]

Because the Amendment was not accomplished in one of the four methods set forth in § 11.13.A., that section might be thought to be of cold comfort to the defendants. Instead, they grasp on to the reference to § 4.3 in that section as vital evidence of the General Partner's amendment power.

This reference to § 4.3 occurs only in a portion of § 11.13.A. that subjects the four methods to amend the Partnership Agreement to an explicit proviso. That proviso requires "written consent of *all* of the Investor Limited Partners"[27] for certain types of amendments—that is, unanimous written approval of the limited partners.

By its plain terms, the effect of the reference to § 4.3 is solely to exempt from the requirement of unanimous written consent an amendment which would "adversely affect (other than as permitted under by Section 4.3) the [distributional] rights of the Investor Limited Partners under Article IX."[28] But the defendants argue that this reference has a more substantial effect. In their words, this portion of § 11.13.A.(iv) stands for the proposition that "[w]ritten consent of *all* of the limited partners is required for amendment to Article IX, the distribution provisions, *except* amendments permitted by Section 4.3,

which specifically permits the General Partner to sell additional limited partnership interests on whatever terms and conditions it shall determine, *without the Consent of the Limited Partners*."[29]

It is conceivable that the drafters of the Partnership Agreement believed that the reference to § 4.3 in the proviso to § 11.13.A. would clarify that the General Partner had the unilateral power under § 4.3 to make amendments to the Agreement that would impair the pre-existing rights of the limited partners in order to grant new rights to additional limited partners. Unlike the defendants, however, I do not believe that intention arises unambiguously from the text. Rather, the more obvious and natural reading of § 11.13.-A.(iv)'s reference to § 4.3 is the one that the plaintiffs advance.

Absent the reference to § 4.3 in § 11.13.A.(iv), any amendment to Article IX required in connection with the admission of additional limited partners would have required the unanimous written consent of all the limited partners. Plebiscites resulting in unanimity are obviously rare and enormously difficult to achieve over any matter involving the least bit of controversy. The exemption therefore permitted the General Partner to amend Article IX to grant rights to a new class of units on a lesser showing of support from the limited partners. By only requiring consent of a majority of the limited partners, the General Partner had less of a hurdle to overcome, especially because consent could be generated negatively, by

---

by the General Partner. That is not an argument for the General Partner's power under § 11.2, which is largely ministerial, but is a different way of arguing that § 4.3 gave the General Partner the power to adopt the Amendment unilaterally.

**26.** Partnership Agreement § 11.13.A.

**27.** Partnership Agreement § 11.13.A. (emphasis added).

**28.** Partnership Agreement, § 11.13.A.(iv).

**29.** Def.'s Reply Br. at 7 (emphasis in original).

counting as consenting any unitholders who did not affirmatively express their objection to the proposed amendment.[30]

## D.

For all these reasons, the Agreement, when considered as a whole, is better read to require limited partner consent to any amendment that would affect their substantive rights. Although the General Partner retained important discretion to issue additional limited partner units that could dilute the interests of existing limited partners, it could not amend the Agreement unilaterally to subordinate the contractual rights of the limited partners to a new class of preferred unitholders. Rather, if a new issuance required an amendment to the Agreement affecting the substantive rights of the limited partners, the General Partner was required to obtain the necessary consent. Moreover, even if this is not the only reasonable reading of the Agreement, it is a reading that a reasonable investor could have discerned from the text.

Thus, the plaintiffs' motion for summary judgment on this issue is granted, and the defendants' motion for summary judgment is denied. Having failed to obtain the consent of the limited partners for the Amendment, the General Partner breached the Agreement and the Amendment was therefore invalidly adopted.

## VI.

In the amended complaint, the plaintiffs allege that the Sale of the Hotel Properties, the Wharf Cottages, and the Nantucket Boat Basin was invalid, because the limited partners did not consent to it. The plaintiffs contend that the factual record indisputably supports a finding that the Sale of these substantial portions of the Property implicated the contractual protection contained in § 5.5 of the Agreement. That section states in pertinent part that a majority of the limited partners "shall have the right ... to approve or disapprove the sale of all, or substantially all, of the assets of the Partnership in a single or series of related transactions ..." [31] Because the General Partner effected the sale without such approval, the plaintiffs seek summary judgment on their claim that the Sale violated the Agreement.

The defendants advance a contrary argument. They contend that the record is clear that the sold portions of the Property did not amount to "substantially all" the assets of the Partnership and that § 5.5 was therefore not implicated. Alternatively, they contend that because the Property was owned by Sherburne, a partnership owned and controlled by the Partnership, rather than by the Partnership itself, § 5.5 approval was not required because no assets of the Partnership were in fact sold.

## A.

■ In resolving these cross-motions, I begin with the defendants' alternative argument. The fact that the sold portions of the Property were owned by Sherburne, rather than the Partnership itself, does not help the defendants because they have ignored a provision of the Agreement that bears on the proper interpretation of § 5.5. In § 5.1.B. of the Agreement, the General Partner is empowered, "without Consent of the Limited Partners," to "sell, exchange or develop portions of the Property (but not to sell all or substantially all of the assets in a single or related series of

---

**30.** Partnership Agreement art. I (defining "Consent of the Limited Partners").

**31.** Partnership Agreement § 5.5.

transactions)." When § 5.5 refers to the need for the limited partners to approve a sale of "all, or substantially all, of the assets of the Partnership," it must be interpreted in light of § 5.1.B., which makes clear that the Property was considered a Partnership asset, regardless of the fact that it was held indirectly through Sherburne.

This interpretation also makes practical sense, because the essential purpose of the Partnership was to generate returns through the Property, over which the Partnership exercised total control through the passive Sherburne entity. That the limited partners faced potential tax consequences from transactions involving the Property only strengthens this conclusion. Finally, this interpretation is consistent with the one advanced in the prospectus for the Rights Offering, which informed the prospective limited partners that a sale of all or substantially all the Property was subject to limited partner approval.[32]

### B.

With that argument out of the way, I turn to the core of the parties' dispute, which is over whether the sold portions of the Property constituted "substantially all of the assets" of the Partnership. This resurfaces a difficult policy choice for the Delaware courts. Although the issue is posed here in the context of a limited partnership agreement, it has a more venerable lineage in case law arising under 8 *Del. C.* § 271, which requires stockholder

approval when a corporation sells substantially all of its assets.

This case law is important because a reasonable investor reading § 5.5 of the Agreement would likely believe it embodied a protection akin to that provided to corporate stockholders by § 271.[33] Regrettably, believing that § 5.5 provides the same protection as § 271 does little to provide a limited partner—or a general partner who took that same view—with any concrete guidance about the extent of that protection. Just what does "substantially all of the assets" mean?

A few years ago, I had occasion to summarize the case law under § 271 that has attempted to answer that question, and did so thusly, starting with a quotation from a decision by then Vice Chancellor, and now Justice, Steele:

> The Supreme Court has long held that determination of whether there is a sale of substantially all assets so as to trigger section 271 depends upon the particular qualitative and quantitative characteristics of the transaction at issue. Thus, the transaction must be viewed in terms of its overall effect on the corporation, and there is no necessary qualifying percentage. Such an inquiry is factual in nature. . . .

*Winston [v. Mandor]*, 710 A.2d [835, 843 (Del.Ch.1997)]. As a result, transactions involving various asset percentages have been found to constitute or not constitute a sale of substantially all of a company's assets.[34]

---

**32.** *See* Rights Offering Prospectus at 32.

**33.** *See, e.g., Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.,* 714 A.2d 96, 103 (Del. Ch.1998) (applying principles of Delaware corporate law in the limited partnership context).

**34.** At this point in the discussion in *In re GM Class H S'holders Litig.,* 734 A.2d 611, 623

(Del.Ch.1999), I described by way of a footnote several cases pertinent to this issue:

> "*See, e.g., Thorpe v. CERBCO, Inc.,* Del. Supr., 676 A.2d 436, 444 (1996) (affirming a finding that a sale of stock comprising 68% of a company's assets and constituting its primary income generating asset triggers § 271); *Oberly v. Kirby,* Del.Supr., 592 A.2d 445, 464 (1991) (sale of stock comprising

Any wise counselor would therefore approach the question of whether a disposition of a particular division or subsidiary would involve a sale of "substantially all" of a company with extreme caution. Our jurisprudence eschewed a definitional approach to § 271 focussing on the interpretation of the words "substantially all," in favor of a contextual approach focussing upon whether a transaction involves the sale "of assets quantitatively vital to the operation of the corporation and is out of the ordinary and substantially affects the existence and purpose of the corporation." *Gimbel v. Signal Cos., Inc.*, Del.Ch., 316 A.2d 599, 606, *aff'd*, Del.Supr., 316 A.2d 619 (1974). This interpretative choice necessarily involved a policy preference for doing equity in specific cases over the value of providing clear guidelines for transactional lawyers structuring transactions for the corporations they advise. *See* 1 David A. Drexler, et. al., *Delaware Corporation Law and Practice* § 37.03 (1999) ("[*Gimbel*] and its progeny represent a clear-cut rejection of the former conventional view that 'substantially all' in Section 271 meant only significantly more than one-half of the corporation's assets.").[35]

Because our jurisprudence since *Gimbel* has opted for a highly subjective inquiry comprised of "qualitative" and "quantitative" elements,[36] a trial court's discretion to resolve whether a particular sale involved "substantially all of the assets" of an entity on a motion for summary judgment is necessarily constrained. In this case, for example, the defendants argue that the sold portions of the Property could not have been substantially all of the Partnership's assets because they generated none of its net cash flow. The defendants also note that the Partnership continues to own the Commercial Properties, which were valued at $23.6 million as of the Rights Offering and which have generated revenues since the Offering sufficient to support the first distributions ever received by the limited partners.

At the same time, however, the plaintiffs point out that the sold portions of the Property generated nearly 75% of the Partnership's revenue during the five years preceding the Sale. The plaintiffs also note that the Sale resulted in the disposition of what the General Partner has defined in public filings to be three of the Partnership's four "operating units."[37] Indeed, the original offering prospectus for the Partnership described the Hotel Prop-

---

80% of a foundation's assets did not trigger § 271 where the foundation was in the " 'business' of holding investment securities and donating its profits to charity") *Winston*, 710 A.2d at 843 (allegation that transaction involved sale of 60% of company's net assets was a sale of "substantially all" of the company's assets survived motion to dismiss); *Katz v. Bregman*, Del.Ch., 431 A.2d 1274, 1275–1276 (1981) (sale of assets constituting 51% of assets, 45% of sales, and 52.4% of pre-tax net operating income triggers § 271); *Gimbel v. Signal Cos.*, Del. Ch., 316 A.2d 599, 607–608, *aff'd*, Del. Supr., 316 A.2d 619 (1974) (sale of assets comprising 26% and 41% of total and net assets did not trigger § 271, even though they involved the company's oldest business

line); *Bacine v. Scharffenberger*, Del.Ch., C.A. Nos. 7862 & 7866, mem. op. at 7–8, Brown, C., 1984 WL 21128 *3 (Dec. 11, 1984) (sale of assets responsible for 53% of company's net income in 9 months prior to the sale did not trigger § 271 where, among other things, this figure seemed attributable to a bad year had by another company subsidiary)."

**35.** *In re GM Class H S'holders Litig.*, 734 A.2d 611, 623 (Del.Ch.1999).

**36.** *See, e.g., Oberly v. Kirby*, 592 A.2d 445, 464 (Del.1991) (embracing *Gimbel*).

**37.** *See* PX 8 & PX 16.

erties as the "crown jewels" of the portfolio.[38]

The parties have provided me with no reliable basis on which to reconcile their discrepant views regarding the importance of the sold properties. Although there is no dispute that the Commercial Properties are valuable assets, the crucial issue is disputed: how valuable and productive those assets are in comparison to the sold properties? In their submissions, the parties did not summarize in a helpful manner the financial importance of the sold portions of the Property to the Partnership. For example, it is not immediately apparent what the parties contend the fair market value of the sold portions of the Property were in comparison to the retained Commercial Properties as of the time of the Sale. Nor have the parties provided me with any evidence about the effect the sale was expected to have on the Partnership's cash flow.

On this record, the only one of the *Gimbel* factors that can be confidently determined is the one that will rarely help decide a case: whether the transaction is "out of the ordinary."[39] That factor is easily satisfied here. But that, of course, would also be true if the Partnership sold a quarter of its productive assets. Such a sale would not involve substantially all of a partnership's assets in any common sense way but would also not be an ordinary,

run-of-the-mill transaction. Put another way, this aspect of the *Gimbel* test will rarely be of much utility in resolving any close case.

■■■ The two case-dispositive factors in the § 271 test—as articulated in *Gimbel* and later cases—involve a highly subjective and factually intensive consideration of the magnitude of a transaction. The qualitative *Gimbel* factor asks the court to consider whether the Sale "substantially affect[ed] the existence and purpose of the" Partnership?[40] The quantitative *Gimbel* factor involves a determination of whether the Sale involved assets "quantitatively vital to the operation of the" Partnership?[41] From the fragmented record evidence, plausible arguments can be advanced to answer these amorphous inquiries either way.[42]

■■■ These deficiencies in the record persuade me that the cross-motions for summary judgment should be denied. Rather than make a final ruling now, I prefer to decide this issue after a trial, at which the parties should each present evidence regarding the impact of the Sale on the Partnership, in terms of factors such as asset value, revenues, and income when considered on an historical and projected basis. Thereafter, the parties will be asked to apply this economic evidence to

---

38. Hartshorn Aff. Ex. A, at D–4.

39. *Gimbel*, 316 A.2d at 606.

40. *Gimbel*, 316 A.2d at 606.

41. *Id.*

42. In two recent cases, this court summarized some of the previous holdings under § 271, in which sales involving assets comprising more than 50%, but less than 80%, of an entity's productive capacity (measured by reference to asset value, income production, and other

economic factors) were held to trigger the vote requirement in § 271. *See Winston v. Mandor*, 710 A.2d at 835, 843 n. 32 (collecting cases); *In re General Motors Class H Shareholders Litig.*, 734 A.2d at 623 n. 10 (same). In one of those cases, *Winston*, a complaint alleging that a sale involved 60% of the company's net assets and which had generated all of the company's income for a recent six-month period was held to state a claim for breach of a certificate provision tracking § 271. 710 A.2d at 843.

the two key factors set forth in the *Gimbel* test.[43]

## VII.

■ The plaintiffs argue that it is indisputable that the Prospectus for the Rights Offering failed to disclose three material facts and that they are therefore entitled to summary judgment against the General Partner for breach of its fiduciary duty to disclose all material facts bearing on the limited partners' decision whether to participate in the Rights Offering. In assessing this aspect of the plaintiffs' motion, I apply the familiar materiality standard that Delaware has adopted from the federal securities case law.[44] Under this standard, an omitted fact is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[45]

### A.

The plaintiffs argue that it is indisputable that the Frazier Inquiry was a material fact that should have been disclosed in the Prospectus. Because the value of the Property was obviously important to determining whether Preferred Unitholders would receive the 250% Return, the plaintiffs contend that it would have added materially to the total mix of information for the limited partners to have known that the Partnership had received an "offer" of $15 million just six months or so earlier. This information was especially important, because it was necessary to render non-misleading the disclosure about the value of the Hotel Properties and Wharf Cottages that the Prospectus did make, which was that Whittier had appraised their value at $9.85 million.

The defendants warmly contest the materiality of the Frazier Inquiry, pointing out that it conveyed a conditional offer on behalf of an unidentified buyer and that

---

**43.** Each of the parties has raised an argument that merits only attention in a footnote. For the plaintiffs' part, they assert that the General Partner has admitted that § 5.5 applies to the Sale because the General Partner had contemplated seeking unitholder approval for the never-consummated sale of the Commercial Properties to a REIT. The evidence regarding this admission is far from clear. At the most, it tends to show that the General Partner was as uncertain as anyone else about the meaning of "substantially all" and that the General Partner knew that it did not mean something like "90% or more." Moreover, as the defendants point out, if the Commercial Properties were substantially all of the Partnership's assets, then how can the sold portions of the Property also constitute substantially all of its assets? Can a corporation be comprised of two separate bundles of assets, each of which constitutes substantially all of its assets?

For their part, the defendants wish to persuade me to grant summary judgment by recourse to a dictionary. How, they say, can something less than 80% or 90% of the assets

of an entity comprise substantially all of its assets? But, as noted above, Delaware case law on this topic long ago forewent a strict test along these linguistic lines, in favor of a more flexible test that provides more far-reaching protection than the statute's plain language seems to promise. Absent an express articulation in a limited partnership agreement that the use of words identical to § 271 should be interpreted in a manner inconsistent with the meaning giving to them in *Gimbel* and its progeny, a reasonable investor reading the agreement is likely to believe that she was receiving the same protection as a stockholder in a Delaware corporation.

**44.** *See Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del.1985) (adopting materiality standard of *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

**45.** *Malpiede v. Townson*, 780 A.2d 1075, 1086 (Del.2001) (citing *Arnold v. Society for Savings Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994)).

Frazier never followed up on the letter after receiving no response from the Partnership. Not only that, the defendants note that the plaintiffs cancelled Frazier's deposition after receiving documents from him and have failed to identify the potential buyer and, therefore, any evidence that the buyer's offer was serious and capable of being financed. For these reasons, the defendants argue that the Frazier Inquiry was a mere expression of interest that did not ripen into a firm offer. As such, they contend it was immaterial and need not have been disclosed under the teaching of previous decisions of this court.[46]

The defendants' arguments have considerable force, as the record that the plaintiffs have developed about the Frazier Inquiry is less than ideal. At the very least, I harbor doubts about whether the Frazier Inquiry conveyed a firm offer to buy the Hotel Properties. Although the value of the Hotel Properties was, itself, a subject that was obviously material to the limited partners' decision whether to participate in the Rights Offering, what is uncertain is whether the Frazier Inquiry would have contributed in any substantial manner to a proper understanding of that value. Because of the tenuous state of the record, I certainly cannot conclude that it would have at this stage of the case and therefore must deny the plaintiffs' motion for summary judgment on this issue.

 Nonetheless, I will also decline the defendants' offer, conveyed in a footnote,[47] for me to enter summary judgment

in favor of them. By its own terms, the Frazier Inquiry communicated a "offer" of "$15,000,000 cash" for the Hotel Properties.[48] This offer was, of course, conditional, but the defendants have not shown that the conditions could not have been satisfied in a commercially practicable manner. Furthermore, the offer was communicated by Frazier, a broker whom the Partnership itself had asked to be attentive to possible sales opportunities. Finally, the plaintiffs have produced a document that was prepared by personnel at the Bank of Boston in connection with the General Partner's refinancing efforts in February 1997. In that document, the value of the Hotel Properties is estimated at $10 million but with the additional note that the Partnership had "had inquiries recently from potential buyers in excess of this $10MM estimate of value. Management believes it can add substantial value to this portfolio segment over the next several years."[49] This *potential* reference to the Frazier Inquiry suggests that the General Partner believed the $15 million offer to have been serious enough to be used in convincing a financial institution to refinance the Partnership's debt.

Given these various factors, an ultimate determination regarding the materiality of the Frazier Inquiry is best made after a trial.

B.

The Wharf Cottages are built directly on wharves and docks in Nantucket Harbor and are rented out to vacationers. Ac-

---

46. *See, e.g., Skeen v. Jo–Ann Stores, Inc.,* 1999 WL 803974, at *7 (Del.Ch. Sept. 27, 1999) ("Where an expression of interest does not lead to a firm offer, the board has no obligation to disclose the specifics of the expression."), *aff'd,* 750 A.2d 1170 (Del.2000); *In re KDI Corp. S'holders Litig.,* 1988 WL 116448, at *7 (Del.Ch. Nov. 1, 1988) (suggesting that

expressions of interest that do not mature into firm offers need not be disclosed).

47. *See* Defs.' Answering Br. at 21 n. 24.

48. DiCamillo Aff. Ex. 10.

49. Tikellis Aff. Ex. 1 at FBF000268.

cording to the plaintiffs, the Prospectus omitted the material fact that the General Partner intended to build four additional Cottages with twelve rooms on a vacant lot near the White Elephant Hotel.[50] Nor was this plan factored into the Whittier appraisal, resulting in (the plaintiffs allege) an understatement of the value of the Hotel Properties. This understatement, the plaintiffs assert, was consistent with the General Partner's desire to downplay the prospects of the Partnership, so as to dampen limited partner participation in the Rights Offering.

For several reasons, the plaintiffs are not entitled to summary judgment on this issue. First, they have not provided evidence that the General Partner had a firm intention to build four new Wharf Cottages as of the time the Prospectus was issued, and an affidavit by an officer of the General Partner denies that any definitive decision had been reached as of the time of the Rights Offering.[51] Indeed, the evidence the plaintiffs cite regarding the intention to build additional Cottages postdates the Prospectus by several months. Second, the evidence to which the plaintiffs have pointed indicates that the new Cottages would have cost $600,000 to build and would have generated an estimated $100,000 in net operating income annually.[52] These figures tend to suggest immateriality. Finally, the new Wharf Cottages were never built and the Tortoise Lot was sold unimproved, along with the other portions of the Hotel Properties. In sum, the plaintiffs are arguing that they should be granted summary judgment because the Prospectus failed to disclose a plan to build Cottages that might well have been conceived after the Rights Offering, that would have generated modest increases in annual income, and that ultimately was never executed.

## C.

The plaintiffs' last disclosure argument is that the Prospectus omitted the material fact that individual officers and directors of the General Partner were investors in a limited partner of Zero Main, the affiliate of the General Partner which was the guarantor of the Rights Offering. In view of the poor performance of the Partnership during its first nine years, the plaintiffs contend that the limited partners would have found it material to know that actual human beings working for the General Partner were putting their own funds at risk by investing (indirectly) in the Rights Offering. Having been discouraged by nearly a decade without distributions, the limited partners would have viewed this participation by individuals associated with the General Partner as material evidence that there was in fact some real hope that the Preferred Units would receive the promised return.

The plaintiffs admit that the Prospectus informed the limited partners at several places that the guarantor of the Rights Offering was an affiliate of the General Partner. They also admit that the limited partners were told that the guarantor would buy all the Preferred Units that were not subscribed for by the limited partners, a guarantee that required a commitment to provide over $10 million in cash if fully called upon.

**50.** The plaintiffs are unclear about the source of the funds that were to be used for this purpose. The evidence they have submitted suggests that the source was not expected to be the funds from the Rights Offering, but instead from the loan proceeds to be generated from a refinancing. Tikellis Aff. Ex. 1 (credit request summary).

**51.** *See* Braverman Aff.

**52.** Tikellis Aff. Ex. 1 at FBF000268.

The plaintiffs say, however, that this disclosure was insufficient to let the limited partners know that the General Partner believed that there was value to be gained by purchasing the Preferred Units. Because the General Partner and its affiliates are not household names like General Electric or McDonald's, the limited partners could not have been expected to take any comfort from the disclosures that were actually made. By contrast, had the Prospectus said that, for example, Michael Ashner, the General Partner's CEO, was investing his own money indirectly in the Preferred Units, this would have signaled to the limited partners that a valuable opportunity was on the table. As part of their plea, the plaintiffs' lawyers go so far as to portray their own class representative clients—a manufacturer, an owner of a chain of automobile dealerships, and a self-described "country lawyer"—as too unsophisticated to understand the implications of what the Prospectus did disclose.[53] This appeal is a bit strange, given that only sophisticated investors with impressive incomes and net worths were eligible to buy units in the Partnership when it was initially formed.

■ In deciding this motion, I will put aside any consideration of the idiosyncratic natures of the named plaintiffs and focus on whether a hypothetical reasonable investor would have found the omitted information material. When viewed from that perspective, the plaintiffs' motion must be denied. Any reasonable reader of the Prospectus would have known that an affiliate of the General Partner was willing to put up over $10 million of its own money to buy the new Preferred Units. The inference one would draw from that disclosure is that the General Partner believed that this was an attractive investment opportunity, even in light of the risks involved. The additional disclosure that individuals who worked for the General Partner were indirectly investing in the affiliate that was the guarantor of the Rights Offering would have added little value to the Prospectus.

In this regard, I hesitate to make the psycho-sociological judgment that reasonable investors are likely to place more importance on an investment to be made by a General Partner's officers and directors than by an affiliate of the General Partner. A cold-eyed reader of the Prospectus would have known that the General Partner's affiliate was committed to purchasing all of the Preferred Units if they were available and would have been positioned by that disclosure to draw the inference that the plaintiffs contend for—which is that the Preferred Units had a real chance of paying off.

## VIII.

■ The last issue to be decided is defendant Zero Main's motion for summary judgment. Zero Main was sued for aiding and abetting breaches of fiduciary duty by the General Partner. To sustain their claim against Zero Main, the plaintiffs must prove the existence of a fiduciary relationship, a breach of duty by the General Partner, Zero Main's knowing participation in the breach, and damages resulting from the concerted action.[54]

■ Zero Main asserts that the plaintiffs' claim must be dismissed because they have failed to develop admissible evidence of Zero Main's knowing participation in any breach of duty. In making this argument, Zero Main seeks to benefit from the fact that it was established by the General Partner's parent for the sole purpose of

**53.** Pls.' Partial Summ. J. Br. at 28 n. 8.

**54.** See *Malpiede v. Townson,* 780 A.2d 1075, 1095 (Del.2001).

investing in the Rights Offering and that officers of the General Partner have only a vague recollection of its structure. But it is precisely because Zero Main was formed by the General Partner's parent for the specific purpose of the Rights Offering that a reasonable inference of knowing participation can be drawn. The primary investor in Zero Main was the General Partner's parent. The only other investors were officers and directors of the General Partner and its parent. Therefore, the knowledge that the General Partner had about the Rights Offering can be fairly imputed to Zero Main because Zero Main was the instrumentality through which the General Partner's parent carried out its purchase of the Preferred Units.[55]

■■■■ For similar reasons, Zero Main's other argument in support of its motion is without force. That argument involves the contention that Zero Main's alleged concerted activity with the General Partner caused no cognizable harm to the limited partners, because there is no evidence that Zero Main had any involvement with the Rights Offering or the later Sale. A triable issue regarding Zero Main's responsibility for injuries suffered by the plaintiffs exists, however, because it was the investment vehicle used by the General Partner to hold the Preferred Units and to reap any profits from the General Partner's (allegedly) wrongful conduct in consummating the challenged transactions.[56]

## IX.

For the foregoing reasons, the plaintiffs' motion for partial summary judgment is denied, except as to their claim that the General Partner breached the Partnership Agreement by purporting to amend the Agreement without limited partner approval. As to that claim, summary judgment is granted to the plaintiffs as to liability. The defendants' motion for partial summary judgment is denied in all respects. The parties shall submit a conforming order within ten days.

---

55. *Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.*, 1995 WL 694397, at *16 (Del.Ch. Nov.21, 1995).

56. *Carlton Invs.*, 1995 WL 694397, at *15.