# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE KINDER MORGAN, INC. | ) | CONSOLIDATED |
| CORPORATE REORGANIZATION | ) | C.A. No. 10093-VCL |
| LITIGATION | ) | |

## MEMORANDUM OPINION

Date Submitted: October 31, 2014
Date Decided: November 5, 2014

Elizabeth M. McGeever, Patrick W. Flavin, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Norman Berman, Nathaniel L. Orenstein, BERMAN DEVALERIO, Boston, Massachusetts; Joseph J. Tabacco, Jr., BERMAN DEVALERIO, San Francisco, California; Jay W. Eng, BERMAN DEVALERIO, Palm Beach Gardens, Florida; *Attorneys for Plaintiff The Haynes Family Trust.*

Peter B. Andrews, Craig J. Springer, ANDREWS & SPRINGER LLC, Wilmington, Delaware; Jason M. Leviton, Steven P. Harte, Joel A. Fleming, BLOCK & LEVITON LLP, Boston, Massachusetts; *Attorneys for Plaintiff William Bryce Arendt.*

Collins J. Seitz, Jr., Bradley R. Aronstam, S. Michael Sirkin, Nicholas D. Mozal, SEITZ ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Joseph S. Allerhand, Seth Goodchild, Adam J. Bookman, Amanda K. Pooler; WEIL, GOTSHAL & MANGES, New York, New York; *Attorneys for Defendants Kinder Morgan, Inc., Kinder Morgan G.P., Inc., El Paso Pipeline GP Company, L.L.C., E Merger Sub LLC, P Merger Sub LLC, Richard D. Kinder, Thomas A. Martin, and Steven J. Kean.*

David J. Teklits, Kevin M. Coen, Daniel C. Homer, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; David D. Sterling, Danny David, BAKER BOTTS L.L.P., Houston, Texas; *Attorneys for Defendants Ted A. Gardner, Gary L. Hultquist, Perry M. Waughtal, Kinder Morgan Energy Partners, L.P., and Kinder Morgan Management, LLC.*

Srinivas M. Raju, Brock E. Czeschin, Sarah A. Clark, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Michael C. Holmes, Elizabeth C. Brandon, VINSON & ELKINS LLP, Dallas, Texas; *Attorneys for Defendants El Paso Pipeline Partners, L.P., Ronald L. Kuehn, Jr., Arthur C. Reichstetter, and William A. Smith.*

**LASTER, Vice Chancellor.**

Defendant Kinder Morgan Energy Partners, L.P. (the "Partnership") has entered into an agreement and plan of merger (the "Merger Agreement") that calls for the Partnership to merge with a wholly owned subsidiary of defendant Kinder Morgan, Inc. ("Parent"), which is the entity that controls the Partnership (the "Merger"). The parties to the Merger Agreement believe that the Merger only needs approval from holders of a majority of the Partnership's three classes of limited partner units, voting together as a single class. The plaintiffs contend that the Partnership's Third Amended and Restated Agreement of Limited Partnership dated as of May 18, 2001, as amended (the "Partnership Agreement" or "PA"), requires that the Merger receive approval from (i) the holders of two-thirds of the Partnership's three classes of limited partner units, voting together as a single class, (ii) the holders of two-thirds of the Partnership's Common Units, one of the three classes of limited partner units, voting as a separate class, and (iii) the holders of 95% of the Partnership's three classes of limited partner units, voting together as a single class, unless the Partnership obtains an opinion from counsel to the effect that the Partnership will continue to be taxed as a pass-through entity after the Merger.

The plaintiffs have sought a preliminary injunction against the closing of the Merger pending a final decision by this court after trial, unless the defendants earlier take action to amend the Merger Agreement to require the limited partner votes that the plaintiffs contend are required. This decision holds that the plaintiffs are not entitled to a preliminary injunction because they do not have a reasonable probability of success on the merits of their voting rights claim. Under the plain language of the Partnership

1

Agreement, the Merger only requires the affirmative vote of holders of a majority of the outstanding limited partner units, voting together as a single class.

## I.    FACTUAL BACKGROUND

The facts are drawn from the documents submitted to the court in connection with the preliminary injunction application. For purposes of the voting rights claim, the facts are undisputed.

### A.    The Partnership

The Partnership is a publicly traded Delaware limited partnership. The Partnership's general partner interest is owned by defendant Kinder Morgan G.P., Inc. (the "General Partner"). The General Partner is a wholly owned subsidiary of Parent. Parent's shares of common stock trade on the New York Stock Exchange under the symbol "KMI."

The General Partner controls Kinder Morgan Management, LLC (the "GP Delegate"), to whom it has delegated authority to manage the Partnership. The GP Delegate has issued two classes of member interests: voting member interests, all of which are owned by the General Partner, and non-voting member interests, which trade publicly on the New York Stock Exchange under the symbol "KMR."

The Partnership's limited partner interest is divided into three classes of units: Common Units, Class B Units, and I-Units. As of August 7, 2014, the Partnership had issued and outstanding 325,113,505 Common Units, 5,313,400 Class B Units, and 131,281,766 I-Units (collectively, the "Outstanding Units"). Generally speaking, all of the Outstanding Units have voting rights and vote together as a single class, subject to

specific provisions in the Partnership Agreement that establish supermajority voting requirements and class voting requirements for particular matters.

The Partnership's Common Units trade on the New York Stock Exchange under the symbol "KMP." Parent owns all of the Class B Units. GP Delegate owns all of the I-Units. Through its control over the General Partner and the GP Delegate, Parent controls the Partnership and owns 100% of its general partner interest. Through Parent's direct or indirect ownership of all of the Class B Units, all of the I-Units, and 6.8% of the Common Units, Parent owns 37% of the Partnership's limited partner interest.

**B.    The Merger**

As the previous section outlines, Parent, GP Delegate, and the Partnership are part of a complex entity structure with three levels of public ownership. Parent also controls El Paso Pipelines Products, L.P. ("El Paso"), another publicly traded Delaware limited partnership, which adds a fourth form of public ownership. On July 17, 2014, Parent proposed to simplify its structure by acquiring all of the publicly traded interests in the Partnership, the GP Delegate, and El Paso through a series of mergers. Parent would emerge as the only publicly traded entity with the other entities continuing as its wholly owned subsidiaries. Parent and its publicly traded subsidiaries eventually entered into two merger agreements, one governing the Partnership side of the structure and another governing the El Paso side. Each transaction is cross-conditioned on the other. The current application focuses on the Merger Agreement.

In the Merger, the Partnership will merge with P Merger Sub, LLC, a Delaware limited liability company, in a reverse triangular merger that will leave the Partnership as

3

the surviving entity. Each publicly held Common Unit will be converted into the right to receive, at the election of the holder, (i) $91.72 in cash (the "Cash Consideration"), (ii) 2.4849 shares of Parent common stock (the "Stock Consideration"), or (iii) 2.1931 shares of Parent common stock and $10.77 in cash (the "Mixed Consideration"). The Partnership Agreement will not be amended in the Merger. The Merger Agreement provides for approval of the Merger by a simple majority vote of the Outstanding Units, voting together as a single class.

## C. This Litigation

The plaintiffs own more than 26,000 Common Units. They contend that because the Merger will convert the each Common Unit into the right to receive the Cash Consideration, the Mixed Consideration, or the Stock Consideration, the Partnership Agreement requires that the Merger clear higher voting thresholds. The plaintiffs also contend that the terms of the Merger are unfair to the public holders of Common Units because, among other reasons, the Merger will constitute a taxable event for those holders. The plaintiffs have moved for a preliminary injunction based on their voting rights theories. The substantive merits of the Merger are not at issue on the current application.

## II. LEGAL ANALYSIS

To obtain a preliminary injunction, the plaintiffs must demonstrate (i) a reasonable probability of success on the merits, (ii) irreparable harm that will occur absent injunctive relief, and (iii) that the balancing of the equities favors the issuance of an injunction. *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 179

(Del. 1986). "[A] failure of proof on one of the elements will defeat the application." *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del. Ch. 1998). Because the plain language of the Partnership Agreement only requires that the Merger be approved by the affirmative vote of holders of a majority of the Outstanding Units, voting together as a single class, the plaintiffs cannot establish a reasonable probability of success on the merits of their voting rights claim. Their application for a preliminary injunction is denied.

## A.    Principles Of Contract Interpretation

The plaintiffs' voting rights claim maintains that the closing of the Merger as currently structured would violate the Partnership Agreement. Principles of contract interpretation apply to limited partnership agreements. *Norton v. K–Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013). A court applying Delaware law will "construe them in accordance with their terms to give effect to the parties' intent." *Id.* To do so, the reviewing court will "give words their plain meaning unless it appears that the parties intended a special meaning." *Id.* When determining the plain or special meaning of a provision, the court "must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985). "[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." *Id.*

"If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding

5

of intent." *City Investing Co. Liquidating Trust v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993). If a provision in a limited partnership agreement is ambiguous, then "if a limited partnership agreement was the product of negotiations among the parties, the court will resolve an ambiguity by examining relevant extrinsic evidence." *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 2000 WL 1476663, at *8 (Del. Ch. Sept. 27, 2000) (Strine, V.C.). "Where a limited partnership agreement was drafted exclusively by the general partner, the court will interpret ambiguities against the drafter, rather than examine extrinsic evidence." *Id.*; *accord Norton*, 67 A.2d at 360; *In re Nantucket Island Assocs. Ltd. P'ship Unitholders Litig.*, 810 A.2d 351, 355 (Del. Ch. 2002) (Strine, V.C.). "Contract language is not ambiguous merely because the parties dispute what it means. To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

## B.    The Voting Requirement That Governs The Merger

Section 17-211 of the Delaware Revised Uniform Limited Partnership Act ("DRULPA") authorizes a domestic limited partnership to merge with another business entity. 6 *Del. C.* § 17-211. Section 17-211(b) states:

> *Unless otherwise provided in the partnership agreement,* an agreement of merger or consolidation or a plan of merger shall be approved . . . (1) by all general partners, and (2) by the limited partners or, if there is more than 1 class or group of limited partners, then by each class or group of limited partners, in either case, by limited partners who own more than 50 percent of the then current percentage or other interest in the profits of the domestic limited partnership owned by all of the limited partners or by the limited partners in each class or group, as appropriate.

*Id.* (emphasis added). Section 17-211(b) provides that through the merger, "interests in [the limited partnership] may be exchanged for or converted into cash, property, rights or securities of, or interests in" the post-merger entity or another business entity. *Id.* Section 17-211 also authorizes a merger to effect amendments to the limited partnership agreement of the surviving entity, assuming it is a limited partnership. Section 17-211(g) states that "[a]n agreement of merger . . . may (1) effect any amendment to the partnership agreement or (2) effect the adoption of a new partnership agreement for a limited partnership if it is the surviving or resulting limited partnership in the merger . . . ." *Id.* § 17-211(g). Under the statutory default rule, if an amendment to a partnership agreement is implemented by merger, the limited partnership need only comply with the requirements for effecting a merger, not any separate requirements for effecting a standalone amendment to the limited partnership agreement.[1]

Article XVI of the Partnership Agreement contains provisions generally consistent with Section 17-211, but it changes the voting requirement. Section 16.1 of the Partnership Agreement authorizes the Partnership to "merge or consolidate" with virtually any type of business entity, including an LLC like P Merger Sub. *See* PA § 16.1 ("The Partnership may merge or consolidate with one or more corporations, business trusts or associations . . . or unincorporated businesses . . . pursuant to a written agreement of merger or consolidation . . . ."). Section 16.2 contemplates mergers in

_____

[1] At oral argument, the plaintiffs advanced for the first time an argument about a predecessor version of Section 17-211(g). That argument was not raised in a timely way that gave the defendants fair notice and the ability to respond. It was waived.

7

which units are converted into cash or securities of either the "Surviving Business Entity" or any "other entity." *Id.* § 16.2(d).

Section 16.3(b) prescribes the required unitholder vote:

> The Merger Agreement shall be approved upon receiving the affirmative vote or consent of at least a majority of the Outstanding Units *unless the Merger Agreement contains any provision which, if contained in an amendment to this Agreement, the provisions of this Agreement or the Delaware Act would require the vote or consent of a greater percentage of the Outstanding Units or of any class of Limited Partners, in which case such greater percentage vote or consent shall be required for approval of the Merger Agreement.*

*Id.* § 16.3(b) (emphasis added). The non-italicized portion of Section 16.3(b) resembles the statutory default language by requiring the affirmative vote of holders of a majority of the Outstanding Units voting as a single class, but it omits the additional statutory default requirement of a separate approval by a majority of each class of limited partners. In lieu of that requirement, the italicized portion of Section 16.3(b) contemplates a greater voting requirement if "the Merger Agreement contains any provision which, if contained in an amendment to this Agreement, the provisions of this Agreement or the Delaware Act would require the vote or consent of a greater percentage of the Outstanding Units or of any class of Limited Partners." If that is the case, then the greater voting requirement applies to the merger. This decision refers to the italicized language as the "Amendment-By-Merger Exception."

The plain meaning of the Amendment-By-Merger Exception alters the statutory default rule under which only the voting standard in Section 17-211(b) governs a merger, even if the merger effectuates an amendment to the limited partnership agreement of the

8

surviving entity. The Amendment-By-Merger Exception ensures that if an amendment would have required a higher voting standard, then that higher voting standard applies, even if the amendment is effectuated through a merger. In this way, the Amendment-By-Merger Exception addresses the possibility that an amendment to the Partnership Agreement could be implemented through a merger and thereby circumvent a higher voting requirement that otherwise would apply to a standalone amendment.

The problem addressed by the Amendment-By-Merger Exception is a familiar one, as is the solution. Professor Ernest L. Folk described the same basic scenario in his comprehensive report on the Delaware General Corporation Law (the "DGCL"). Professor Folk explained that

> [a] number of jurisdictions, unlike Delaware, require a vote by classes of stock, not generally, but when some provision of the plan of merger effects a change in the rights or preferences of a particular class which change, if made by an amendment to the certificate rather than through a merger, would call for a class vote. This is just and fair . . . . [I]t is appropriate that class interest be as much protected when the identical change is made by one route (merger) as by another (certificate amendment).

Ernest L. Folk, III, *Review of The Delaware General Corporation Law for the Delaware Corporation Law Revision Committee 1965–1967*, at 186 (1968). Professor Folk recommended that the DGCL be revised to address this scenario by incorporating the following language:

> Any class of shares of any corporation shall be entitled to vote as a class if the plan of merger or consolidation contains any provision which, *if contained in a proposed amendment to the certificate of incorporation*, would entitle such class of shares to vote as a class under the provision of subsection (d)(1) of Section 242 (Amendment of Certificate of Incorporation after Payment of Capital, etc.).

*Id.* at 189 (emphasis added). Professor Folk's recommendation came in response to the *Havender* decision, which upheld the amendment-by-merger approach under the doctrine of independent legal significance. *See Fed. United Corp. v. Havender*, 11 A.2d 331, 343-44 (Del. 1940) ("To say that the right to such dividends may not be destroyed by charter amendment . . . is not to say that the right may not be compounded under the merger provisions of the law . . . .").

For purposes of the DGCL, Professor Folk's recommendation was not adopted, and the doctrine of independent legal significance remains a cornerstone principle of interpretation that governs the application of Delaware's business entity statutes. But the rejection of Professor Folk's approach as a general statutory default does not prevent the drafters of constitutive documents, such as the Partnership Agreement, from providing the additional protection that Professor Folk contemplated on an entity-specific basis. That is what Amendment-By-Merger Exception does.

In this case, the Partnership Agreement is not being amended in the Merger, and the Amendment-By-Merger Exception does not apply. The only vote required for the Merger is the affirmative vote of at least a majority of the Outstanding Units.

## C.    The Plaintiffs' Contrary Interpretation

The plaintiffs read the Amendment-By-Merger Exception differently. Rather than having the Amendment-By-Merger Exception turn on whether the Merger actually amends the Partnership Agreement, the plaintiffs contend that the exception requires that the parties consider whether a substantially similar result could be accomplished through an amendment to the Partnership Agreement. The plaintiffs then look to the provisions

10

that govern amendments to the Partnership Agreement to determine what voting standard would apply if an amendment to the Partnership Agreement was used to achieve the substantially similar result.

Ordinarily, an amendment to a limited partnership agreement is separate and distinct from a merger involving a limited partnership. Section 17-302 of DRULPA establishes the default voting standard for amending a limited partnership agreement. 6 *Del. C.* § 17-302. When the General Assembly adopted DRULPA in 1983, the statute did not contain any provision addressing how a partnership agreement could be amended. *Nantucket Island Assocs.*, 810 A.2d at 364. Because the statute lacked a default amendment procedure and because a limited partnership agreement is a contract among all partners, Delaware decisions held that unanimous consent was required to amend a limited partnership agreement unless the agreement provided for an alternative method. *See Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati, Inc.*, 1996 WL 506906, at *11 (Del. Ch. Sept. 3, 1996), *aff'd*, 692 A.2d 411 (Del. 1997); *Kan. RSA 15 Ltd. P'ship v. SBMS RSA, Inc.*, 1995 WL 106514, at *2 (Del. Ch. Mar. 8, 1995) (Allen, C.). The General Assembly codified this rule in 1998 by adopting Section 17-302(f), which states: "If a partnership agreement does not provide for the manner in which it may be amended, the partnership agreement may be amended with the approval of all the partners or as otherwise permitted by law, including as permitted by § 17-211(g) of this title." 6 *Del. C.* § 17-302(f). The reference to Section 17-211(g) confirms that a limited partnership agreement can be amended through a merger. Section 17-302(f) likewise codifies the rule that a partnership agreement can establish a different process

11

for amendments: "If a partnership agreement provides for the manner in which it may be amended . . . it may be amended only in that manner[.]" *Id.* § 17-302(f).

The Partnership Agreement contains lengthy and complex provisions that address the manner by which it may be amended. Framed at a high level of generality, the provisions establish four tiers in which the extent of approval required by the Partnership Agreement increases with the significance of the amendment. Under the first tier, the General Partner can adopt unilaterally certain identified categories of amendments (the "Unilateral Amendments"). *See* PA § 15.1. Under the second tier, an amendment other than a Unilateral Amendment requires the approval of two-thirds of the Outstanding Units, voting together as a single class (the "Two-Thirds Default Vote"). *See id.* § 15.2. Under the third tier, an amendment that otherwise would require approval under the Two-Thirds Default, but which has a materially adverse effect on one class of limited partners, also requires approval from two-thirds of the units in the affected class (the "Two-Thirds Class Vote"). *See id.* § 15.2 & 15.3(c). Under the final tier, if the Partnership cannot obtain an opinion of counsel that the Partnership will continue to be taxed as a partnership, the amendment requires approval from 95% of the Outstanding Units, voting together as a single class (the "95% Vote"). *See id.* § 15.3(d)

In this case, the plaintiffs focus on the fact that the Merger will convert each publicly held Common Unit into the right to receive the Cash Consideration, the Stock Consideration, or the Mixed Consideration. The plaintiffs then examine Sections 15.1, 15.2, and 15.3 to determine which tier addresses this type of amendment. Observing that the list of Unilateral Amendments does not identify such an amendment, the plaintiffs

conclude that, at a minimum, the amendment must meet the Two-Thirds Default Vote. Further observing that the Common Units are being converted while the Class B Units and I-Units are not, they argue that such an amendment has a materially adverse affect on the Common Units, triggering the Two-Thirds Class Vote. Finally they contend that such an amendment must meet the 95% Vote, unless the Partnership obtains an opinion from tax counsel to the effect that the Partnership would continue to be taxed as a pass-through entity after the amendment, and therefore the same opinion from tax counsel must be obtained for the Merger.

This manner of reasoning trips at the threshold. The plaintiffs cannot explain how any amendment to the Partnership Agreement could accomplish the conversion of the publicly held Common Units into the right to receive the Cash Consideration, the Stock Consideration, or the Mixed Consideration. Both Section 17-211 of DRULPA, which authorizes mergers, and Section 16.2 of the Partnership Agreement, which implements that authority in an entity-specific way, authorize the conversion of one type of units into a right to receive other forms of consideration, including cash or the securities of another entity. Neither DRULPA nor the Partnership Agreement provides similar authorization for amendments to the partnership agreement. The plaintiffs' briefs never confronted this problem, contending only that if the section of the Partnership Agreement addressing Unilateral Amendments did not provide expressly for conversion, then the higher voting standards must apply. But there is a different explanation for why the section of the Partnership Agreement addressing Unilateral Amendments did not provide expressly for

13

conversion: that act cannot be accomplished by an amendment to the Partnership Agreement.

Sometimes it helps to return to first principles. A limited partnership is a written document, like any other contract or the opinion I am now writing. Through an amendment to a limited partnership agreement, the parties to the agreement can revise its terms, just as I can revise this opinion. The revised agreement can contain different language on any manner of subjects, including the rights and obligations of the partnership interests governed by that agreement. But the effectiveness of what can be accomplished by an amendment is limited to what can be achieved by changing the words of that document. No matter how often one of my opinions may be revised, it remains one of my opinions. No matter how extensively the provisions governing a partnership interest are revised, they remain provisions governing a partnership interest.

Because of this basic limitation, the agreement of one entity cannot be re-written so that its units become units in a different limited partnership, or in this case the equity interests in a corporation, which is a different type of entity entirely. For purposes of this case, this would mean re-writing the provisions of the Partnership Agreement governing the Common Units so that those units transform into shares of common stock of Parent. Note that the task is not to re-write the terms of the Common Units so that they have different rights, such as a guaranteed right to distributions or different voting rights. Nor is the task to re-write the terms of the Common Units so that they parallel the rights of shares of common stock of Parent. Rather the challenge is the alchemist's quest: the

transmutation of one substance (traditionally a base metal, here Common Units) into a wholly different substance (traditionally gold, here common stock in Parent).

It does not seem possible that an amendment could achieve this result. No matter how extensively the provisions of the Partnership Agreement are revised and rewritten, they remain provisions of the Partnership Agreement. A Partnership Agreement cannot turn itself by amendment into something entirely different, any more than I could revise one of my decisions to change it into a ruling by another judge or a different court.

In response to questioning on this point at oral argument, the plaintiffs offered two possible means for achieving an economic outcome similar to the Merger. Neither would involve an amendment alone. Both would combine an amendment with some other act. In the first scenario, the plaintiffs suggested that the Partnership could achieve the economic equivalent of the conversion of Common Units into the Stock Consideration by distributing shares of Parent common stock to holders of Common Units, then amending the Partnership Agreement to cancel the Common Units. Having pondered this example, it seems to me that a result more closely equivalent to the election provided in the Merger Agreement could be achieved if the Partnership distributed a new security to the holders of Common Units that would give each holder the right to receive, at the holder's election, the equivalent of the Cash Consideration, the Stock Consideration, or the Mixed Consideration, then amended the Partnership Agreement to cancel the Common Units. As their second alternative, the plaintiffs suggested an amendment to the Partnership Agreement that would build a redemption right into the provisions governing the Common Units. The redemption right would require the Partnership to buy, and the

holder of the Common Unit to sell, each publicly traded Common Unit for consideration equivalent to the Cash Consideration, the Stock Consideration, or the Mixed Consideration, at the holder's election. The Partnership then would exercise the redemption right, or it could be triggered automatically under the terms of the amendment. *See Edelman v. Phillips Petroleum Co.*, 1985 WL 11534, at *7 (Del. Ch. Feb. 12, 1985). In neither case is the amendment accomplishing the same result as the Merger. In each case the amendment forms one part of a series of steps that produce an outcome substantively similar to the Merger. Neither of the plaintiffs' examples addresses the core problem: an amendment to the Partnership Agreement cannot accomplish what the Merger is accomplishing, meaning that the provisions governing amendments logically cannot apply.[2]

---

[2] Even the most simple aspect of the Merger—the conversion into the Cash Consideration—could not be accomplished by amendment alone. It is true that business entities often use reverse splits to reduce their outstanding equity and cash out small holders. It is also true that a reverse split usually is accomplished by amending the entity's constitutive document. *Applebaum v. Avaya, Inc.*, 812 A.2d 880, 882-83 (Del. 2002) (describing operation of reverse split); *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 453 (Del. Ch. 2011) (same). But even in the most common and straightforward case of a corporation that effects a reverse split under Section 242 of the DGCL, 8 *Del. C.* § 242(a)(3), the charter amendment is not the mechanism that converts the shares into cash. The charter amendment produces fractional shares. A different section of the DGCL—Section 155—generally authorizes a corporation to choose not to issue fractions of a share and to pay cash in lieu of fractional shares. 8 *Del. C.* § 155; *see Applebaum*, 812 A.2d at 887-94; *Reis*, 28 A.3d at 455. Even in the familiar corporate scenario, the charter amendment alone cannot rewrite the powers, preferences, and rights of the shares, or the qualifications, limitations, or restrictions thereof, to convert them into cash. *See* 8 *Del. C.* § 102(a)(4); *accord* 8 *Del. C.* § 151(a).

Ignoring this difficulty, the plaintiffs contend that to determine what voting standard governs the Merger, the parties to the Merger Agreement were obligated to think through possible transaction structures like these, identify hypothetical means by which the economic equivalent of the Merger could be achieved through an alternative that would involve an amendment to the Partnership Agreement, determine what voting standards would apply to the hypothetical alternative, and then apply that same standard to the Merger. In my view, such an analysis is inconsistent with the plain language of the Amendment-By-Merger Exception, which requires an amendment to the Partnership Agreement. Because it requires an amendment to the Partnership Agreement, the Amendment-By-Merger Exception necessarily also requires that the subject matter be something that could be accomplished by amendment.

The plaintiffs' interpretation of the Amendment-By-Merger Exception would cause the provision to operate in a manner far removed from how Delaware law approaches questions of transactional validity. Testing whether a transaction complies with the applicable business entity statute or the organizational documents of the entity is a different inquiry than determining whether those in control of the entity have exercised their powers in compliance with their fiduciary duties:

> [I]n every case, corporate action must be twice tested: first, by the technical rules having to do with the existence and proper exercise of the power; second, by equitable rules somewhat analogous to those which apply in

17

favor of a *cestui que trust* to the trustee's exercise of wide powers granted to him in the instrument making him a fiduciary.[3]

Chancellor Allen made the following comments about statutory analysis under the DGCL, but in my view they apply fully whenever a court analyzes a transaction for compliance with a business entity statute or the entity's constitutive documents. I have therefore taken the liberty of altering the quotation to substitute references to "business entities" for references to "corporations":

> As a general matter, those who must shape their conduct to conform to the dictates of statutory law should be able to satisfy such requirements by satisfying the literal demands of the law rather than being required to guess about the nature and extent of some broader or different restriction at the risk of an *ex post facto* determination of error. The utility of a literal approach to statutory construction is particularly apparent in the interpretation of the requirements of [business entity] law—where both the statute itself and most transactions governed by it are carefully planned and result from a thoughtful and highly rational process.

> Thus, Delaware courts, when called upon to construe the technical and carefully drafted provisions of our statutory [business entity] law, do so with a sensitivity to the importance of the predictability of that law. That sensitivity causes our law, in that setting, to reflect an enhanced respect for the literal statutory language.

*Speiser v. Baker*, 525 A.2d 1001, 1008 (Del. Ch. 1987) (Allen, C.), *appeal refused*, 525 A.2d 582 (Del. 1987) (TABLE). Likewise in the following passage, Chancellor Allen was speaking about the benefits of formalism under the DGCL, but his comments apply to business entities of all stripes, and I have taken the same editorial license:

---

[3] Adolf A. Berle, *Corporate Powers As Powers In Trust*, 44 Harv. L. Rev. 1049, 1049 (1931); *see Sample v. Morgan*, 914 A.2d 647, 673 (Del. Ch. 2007) (Strine, V.C.) (explaining that corporate acts are "'twice-tested'—once by the law and again by equity."); *see also Reis*, 28 A.3d at 457 ("A reviewing court's role is to ensure that the corporation complied with the statute and acted in accordance with its fiduciary duties.").

> [T]he entire field of [business entity] law has largely to do with formality. [Business entities] come into existence and are accorded their characteristics, including most importantly limited liability, because of formal acts. Formality has significant utility for business planners and investors. While the essential fiduciary analysis component of [business entity] law is not formal but substantive, the utility offered by formality in the analysis of our statutes has been a central feature of Delaware [business entity] law.

*Uni-Marts, Inc. v. Stein*, 1996 WL 466961, at *9 (Del. Ch. Aug. 12, 1996) (Allen, C.).

An open-ended inquiry into substantively equivalent outcomes, devoid of attention to the formal means by which they are reached, is inconsistent with the manner in which Delaware law approaches issues of transactional validity and compliance with the applicable business entity statute and operative entity documents. The Amendment-By-Merger Exception provides that if an amendment to the Partnership Agreement is effected by merger under Article XVI, it must comply with the voting standards that would apply if the same amendment was implemented through the amendment process in Article XV. In both cases, there must be an amendment to the Partnership Agreement. The Amendment-By-Merger Exception does not require parties to imagine hypothetical alternative transaction structures that could deploy an amendment to the Partnership Agreement as a step towards a substantively similar result, then make an educated guess at what voting standard might apply if the alternative structure were used. Leaving aside the uncertainty of the initial inquiry, the parties would remain at risk that a creative limited partner might later dream up still another hypothetical alternative transaction structure that would require a higher vote.

The Amendment-By-Merger Exception is best understood as altering one limited aspect of the doctrine of independent legal significance in that it makes an amendment by merger subject to the voting requirements that would govern a standalone amendment. The Amendment-By-Merger Exception does not go further by eliminating the requirement for an amendment in the first place. It is, in my view, implausible to interpret the Amendment-By-Merger Exception as requiring transaction planners to consider hypothetical alternatives and base the voting requirements for the Merger on what might be required for those alternatives.

The parties have advanced other arguments about how the amendment provisions should be read if they do apply to the Merger. Because they do not apply, this decision does not reach those issues.

## III.    CONCLUSION

The Amendment-By-Merger Exception does not apply to the Merger because the Partnership will be the surviving entity in the Merger, and the Merger will not otherwise effect any amendments to the Partnership Agreement. The plaintiffs cannot rely on the Amendment-By-Merger Exception to impose the Two-Thirds Default Vote, the Two-Thirds Class Vote, or the 95% Vote. The plaintiffs do not have a reasonable probability of success on the merits of their voting rights claim, and their application for a preliminary injunction is denied.